**HYDRANAUTICS, Plaintiff,**

**v.**

**FILMTEC CORPORATION, Defendant.**

**No. 93–CV–0476 W(JAH).**

United States District Court,
S.D. California.

Aug. 5, 2003.

Order Denying Reconsideration
Sept. 26, 2003.

See also 982 F.2d 1546.

Jeffrey D. Lewin, Donald G. Rez, Sullivan, Hill, Lewin, Rez and Engel, San Diego, CA, Carl W. Schwarz, Robert E. Kohn, Seth D. Greenstein, Melvin White, Christopher Kliefoth, Karla L. Palmer, Craig P. Seebald, Diane L. Cafritz, Linda M. Hol-

leran, Michael S. Nadel, McDermott, Will and Emery, Washington, DC, John J. Wright, Fish and Neave, Palo Alto, CA, for Plaintiff.

James Richard Martin, Steven Eugene Sletten, Antoinette D. Paglia, Gibson, Dunn and Crutcher, Los Angeles, CA, Bruce M. Kanuch, The Dow Chemical Company, Midland, MI, for Defendant.

## ORDER GRANTING PLAINTIFF HYDRANAUTICS' MOTION FOR PARTIAL SUMMARY JUDGMENT

WHELAN, District Judge.

Plaintiff Hydranautics ("Plaintiff") moves for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant FilmTec Corporation ("Defendant") opposes. The Court finds the matter suitable for disposition on the papers submitted and without oral argument. *See* Civil Local Rule 7.1(d.1). For the reasons expressed below, the Court GRANTS Plaintiff's motion for partial summary judgment.

### I. *BACKGROUND*

On November 17, 1977 Midwest Research Institute ("MRI") scientist John Cadotte invented a reverse osmosis desalinization membrane by reacting trimesoyl chloride ("TMC") and metaphenylene diamene ("MPD"). *FilmTec v. Hydranautics,* 982 F.2d 1546, 1549 (Fed.Cir.1992). At the time of the experiment, MRI had been conducting government reverse osmosis research according to a Saline Water Conversion Act contract. *Id.* at 1548.

One month after recording his initial discovery at MRI, Cadotte resigned and founded Defendant FilmTec Corporation. On February 23, 1978 Cadotte chronicled an identical TMC–MPD chemical reaction. *Id.* at 1553. Subsequently, Cadotte filed a

reverse osmosis membrane patent application and assigned his rights in the claimed invention to Defendant. *Id.* at 1549. The patent application eventually issued as the '344 patent. *Id.*

Defendant is a Dow Chemical Company ("Dow") subsidiary.[1] This malicious prosecution case arises from Defendant's May 1990 patent infringement lawsuit against Plaintiff. In that lawsuit, Defendant alleged that Plaintiff infringed the '344 patent. In defending the action, Plaintiff disputed Defendant's patent title rights. More specifically, Plaintiff argued that Cadotte conceived the invention while working for government contractor MRI. The district court, Honorable Gordon Thompson Jr. presiding, ultimately concluded that Defendant owned lawful title to the '344 patent; the district court enjoined Plaintiff's reverse osmosis membrane manufacturing enterprise.

In December 1992 the Federal Circuit reversed, concluding as a matter of law that: (1) the invention had been conceived on November 17, 1977—prior to Cadotte founding FilmTec; (2) the United States, as opposed to FilmTec, owned the '344 patent; and (3) FilmTec could not maintain a patent infringement suit against Hydranautics. *See id.* at 1554.

Equipped with the Federal Circuit's ruling, Plaintiff filed this malicious prosecution action against Defendant Filmtec in 1993. The Court later consolidated Plaintiff's antitrust claims with its malicious prosecution claims in this case. This case has been heavily litigated for almost three decades. Indeed, the present matter is over 10 years old, arises from facts which took place one quarter of a century ago, and has generated several lengthy Circuit Court opinions. On January 19, 1999 the

---

1. For purposes of the Court's ruling herein, any reference to Defendant FilmTec shall equally apply to its parent corporation, Dow Chemical Co.

Court bifurcated the action and confined the first phase's issue to "whether Defendant FilmTec, its officer, directors, managing agents, attorneys and all others acting on behalf of FilmTec or in concert with it, had and maintained a reasonable belief that the invention disclosed in [the '344 patent] was the lawful property of . . . Cadotte and Defendant FilmTec from the date the invention was conceived through the patent litigation instituted by FilmTec against Plaintiff Hydranautics." (*Order Denying Def's Recon. Mtn.*, Feb. 25, 1999, at 3).

Plaintiff now seeks Rule 56 partial summary judgment on two issues. Plaintiff asks this Court to find as a matter of law that: (1) Dow knew[2] that John Cadotte, inventor of the reverse osmosis membrane disclosed in the '344 patent, made an invalid assignment to FilmTec of his rights to that invention when Dow authorized FilmTec to sue Hydranautics for patent infringement in May 1990; and (2) Dow knew[3] that title to the ['344 patent] relating to the reverse osmosis membrane invention was not vested in FilmTec when it authorized FilmTec to sue Hydranautics for patent infringement. (*Pl's Notice of Mtn.*, June 23, 2003, at 2).

## II. *LEGAL STANDARD*

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56 where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of

the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Rule 56(d) provides for partial summary judgment. *See* FED. R. CIV. P. 56(d) ("[T]he court . . . shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted."). Under Rule 56(d) the court may grant summary judgment on less than the non-moving party's whole claim. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir.2002) (Posner, J.). Partial summary judgment is a mechanism through which the Court deems certain issues established before trial. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n. 3 (9th Cir.1981) (*quoting* 6 MOORE'S FEDERAL PRACTICE ¶ 56.20 (3.-2) (2d ed.1976)). "The procedure was intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." *Id.*

A party seeking summary judgment, either whole or partial, always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrat-

---

**2.** The Court notes that while Plaintiff's Amended Notice of Motion for Summary Judgment (July 24, 2003) seeks adjudication that "Dow knew that John Cadotte . . . made an invalid [patent] assignment." and "Dow knew that title . . . was not vested in Filmtec,"

the Court construes the request as one seeking actual, imputed, or constructive knowledge (e.g., knew or should have known).

**3.** See prior footnote, *supra*.

ing that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). "The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1030 (9th Cir.2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (*citing Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir.1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (*citing Anderson,* 477 U.S. at 252, 106 S.Ct. 2505) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (*quoting* FED. R. CIV. P. 56(e)).

## III. ANALYSIS

### A. DOW KNEW OR SHOULD HAVE KNOWN THAT CADOTTE MADE AN INVALID ASSIGNMENT OF HIS INVENTION RIGHTS DISCLOSED IN THE '344 PATENT WHEN FILMTEC INITIATED PATENT INFRINGEMENT PROCEEDINGS AGAINST HYDRANAUTICS

■ Plaintiff first contends that the undisputed evidence reveals Dow knew or should have known that Cadotte's prior invention assignment to FilmTec was invalid when Defendant commenced patent infringement proceedings against Plaintiff on May 30, 1990. Plaintiff bases this assertion on Dow's alleged knowledge of certain invention-related documents and the subsequent Cadotte assignment. Plaintiff argues that the uncontradicted evidence, taken together, establishes that in May 1990 Dow knew that Cadotte's invention assignment—and associated patent title— to FilmTec was invalid as a matter of law.

The Court agrees.

Plaintiff advances its request for partial summary judgment by principally relying on the following documents:

#### 1. The '6521 Contract

Under the '6521 contract, MRI (through its employees) researched reverse osmosis desalinization membrane technology for the United States Government. (*Seebald Decl.,* Exh. 4 ('6521 Contract, at Art. I)). Title to any discoveries made while working under the '6521 contract vested in the Government. (*Id.* at § 35(b)(2) ("The Contractor...does hereby grant to the Government the full and entire domestic right, title and interest in the Subject Inven-

tion.")). The contract also created a duty that individual researchers under the contract "disclose" inventions (whether patentable or not) and "report" possibly patentable inventions to the Government. (*See id.* at § 35(b)(1)).

The evidence plainly reveals that Dow knew about the '6521 contract, and the contract's express invention assignment requirements, before it authorized the May 1990 patent infringement suit against Plaintiff. For example, several Dow in-house attorneys read the '6521 contract before Dow initiated the patent infringement action: (1) Dow patent attorney Michael Glenn testified that when he conducted due diligence with respect to Dow's 1985 FilmTec acquisition, he knew that Cadotte worked under a government contract at MRI. (*Seebald Decl.*, Exh 16 (Glenn Dep., Dec. 13, 2002, at 161:16–22)); (2) Dow patent attorney Bernd Sandt testified that he read the '6521 contract's patent clause before FilmTec sued Hydranautics. (*Seebald Decl.*, Exh. 18 (Sandt Dep., Apr. 9, 2003, at 36:12–37:4)); (3) Dow patent attorney Philip Shepherd testified that he reviewed the '6521 contract before the patent infringement suit. (*Seebald Decl.*, Exh. 19 (Shepherd Dep., Dec. 12, 1002, at 64: 1–17)); and (4) Dow's senior patent counsel Richard Waterman testified he was aware that Cadotte worked under a government contract at MRI and understood "if [Cadotte] made inventions while working for the government, those inventions belonged to the government." (*Seebald Decl.*, Exh. 20 (Waterman Dep., March 7, 2003, at 124:1–125:17)). Finally, as noted by the Federal Circuit Court of Appeals, "the Contract explicitly provided that MRI does hereby grant to the Government the full and entire domestic right, title and interest in [any invention ... conceived in the course of or under this ['6521] contract or any subcontract.]." *Hydranautics*, 982 F.2d at 1548.

In addition, FilmTec's founders themselves obviously knew about the '6521 contract prior to the May 1990 patent infringement suit against Plaintiff. Specifically, two FilmTec founders—John Cadotte and Robert Peterson—worked *directly* on the research called for and funded by the '6521 contract while employed at MRI. *See Hydranautics*, 982 F.2d at 1549. Cadotte worked as the '6521 contract's senior chemist. (*Seebald Decl.*, Exh. 23 ('6521 Contract Proposal at 3)); *see also Hydranautics*, 982 F.2d at 1548–49. Petersen testified that after he left MRI and began working for FilmTec, he was familiar with the '6521 contract's obligations that inventions discovered thereunder vested with the Government. (*Seebald Decl.*, Exh. 11 (Cadotte–Petersen Dep. (Petersen), Aug. 23, 1988, at 91:10–92:14)) ("I was aware of the language and I fulfilled it."); (*see also Seebald Decl.*, Exh. 3 (Peterson Dep., May 2, 2003, at 11:20–12:9; 187; 7–12)) (Peterson's testimony that he was aware everything Cadotte did at MRI while working on the '6521 contract, every discovery he made, every invention he made, regardless of whether it was patentable or not, belonged to the government).

Indeed, Defendant concedes that at the time it filed the patent infringement action, it knew about the '6521 contract. (*Def.'s Opp.*, July 14, 2003, at 12). Based on this undisputed evidence, the Court finds as a matter of law that no reasonable juror could conclude that Dow did not know about the '6521 contract, and the government assignment provisions contained therein, when Defendant initiated the May 1990 patent infringement action against Plaintiff.

### 2. *Cadotte's MRI Employment Contract*

Notably, the '6521 contract mandated that all subcontracts (e.g., MRI employ-

ment contracts) were likewise bound by the '6521's terms. *Hydranautics*, 982 F.2d at 1548. Significantly, Cadotte's 1976 MRI employment contract required Cadotte to assign to MRI any inventions made: (1) while working at MRI; or (2) for twelve months after departing MRI. (*Seebald Decl.* Exh. 15 (Cadotte–MRI Employment Contract, June 1, 1976, at ¶ 3)). The contract language is clear and unambiguous. Cadotte agreed to "promptly disclose to [MRI] all inventions or discoveries which I, solely or jointly with others, make or conceive during the period of my employment [by MRI], or within one year after the termination of such employment." *Id.*

The evidence reveals that Dow knew or should have known about Cadotte's MRI employment contract when Defendant launched its May 1990 patent infringement suit. The parties do not dispute that Dow acquired Cadotte's FilmTec Corporation on August 7, 1985. In so doing, Dow assumed the rights and liabilities affiliated with FilmTec, including contractual limitations on Cadotte's prior inventions. Indeed, in a 1994 analysis regarding potential legal action against FilmTec's founding members, Dow's legal counsel recognized that Dow faced a "[p]erception problem [as the] big corporation not accepting its risks and attacking the little people." (*See July 21, 2003 Sealed Doc.*, at FTMID04313).

Furthermore, Cadotte did not dispute that he read and signed the MRI employment contract. (*Seebald Decl.*, Exh. 22 (Cadotte Dep., Jan. 19, 2000, at 22:15–24)). Because Cadotte *founded* FilmTec and worked as both a FilmTec and Dow employee, the Court finds Dow (through Cadotte) knew or should have known of Cadotte's MRI employment contract (and resulting obligations) as a matter of law. *See Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 271 (5th Cir. 1981) ("The general rule is well established that a corporation is charged with constructive knowledge, *regardless of its actual knowledge*, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course and scope of his employment within the scope of his authority.").

Defendant's reliance on evidence questioning the precise timing of Dow's actual knowledge of Cadotte's employment contract does not overcome the Court's constructive knowledge finding. (*See Filmtec Opp'n* (July 14, 2003) at 20–21) Specifically, FilmTec argues "Cadotte's testimony is that he did not recall signing the 1976[MRI] Employment Agreement." (*Id.*)

 It is irrelevant that Cadotte—at one particular time—did not remember signing the MRI employment contract because the evidence reveals that Cadotte did indeed execute the agreement. (*See Seebald Decl.*, Exh. 22 (Cadotte Dep., Jan. 19, 2000, at 22:15–24)) (Cadotte acknowledging that he read and signed the MRI employment contract). It is well settled that individuals are imputed to know the terms of the contracts they enter. *See Wilson v. Coffey*, 92 Cal.App. 343, 349, 268 P. 408 (1928) ("[A] person is presumed to have knowledge of the contents of an instrument executed by him or in his possession."). Cadotte undisputedly executed the 1976 MRI employment contract and therefore knew about the contract's invention disclosure requirements.[4] *See FilmTec Corp. v. Allied–Signal, Inc.*, 939 F.2d 1568, 1574 (Fed.Cir.1991) ("Cadotte would

---

4. Filmtec's tenuous suggestion that the '6521 invention reporting requirement was personal only to Cadotte (and not MRI) strains credulity. To adopt this argument, any legal corporation could overcome reporting requirements such as those contained in the '6521 contract by simply relying on their employee's ineffective or untimely invention disclosures.

clearly be on notice of his employment contract."). As such, Dow knew or should have known about Cadotte's MRI employment contract when it initiated the May 1990 patent infringement litigation against Plaintiff.

Standing alone, the '6521 contract and its unambiguous assignment and disclosure obligations, placed Dow on imputed notice that Cadotte's 1977–1978 MRI membranes belonged to the United States and no one else. That Dow eventually learned of Cadotte's 1976 MRI employment contract, which required Cadotte to assign to MRI any inventions made or conceived while working at MRI or *for twelve months after leaving MRI* only further solidifies this conclusion. Invention assignment obligations under either the '6521 contract or the MRI employment agreement required Cadotte to assign his 1977 invention to the government. He unequivocally failed to do so. By extension, Dow is charged with knowledge of that misconduct.

### 3. Cadotte's MRI Laboratory Notebook Page 72 Speaks for Itself

Further supporting a finding of partial summary judgment are Cadotte's MRI lab notebooks and Dow's undisputed examination thereof prior to its 1985 FilmTec acquisition and May 1990 patent infringement lawsuit against Plaintiff here.

Neither party disputes, nor could they, that on November 17, 1977 Cadotte recorded forming three TMC–MPD reverse osmosis desalinization membranes in his MRI laboratory notebook. (*Seebald Decl.*, Exh. 5 (Cadotte Notebook, Nov. 17, 1977, at 72)). *See also Hydranautics*, 982 F.2d at 1549. The evidence likewise establishes that Defendant knew about this notebook entry before initiating its May 1990 patent infringement action. For example, in 1989 Dow's in-house counsel reviewed copies of Cadotte's MRI lab notebooks which recorded the November 17, 1977 MPD–TMC

membrane invention. (*Seebald Decl.*, Exh. 26 (Response No. 9 to Hydranautics' Fourth Set of Interrogatories, Jan. 24, 2000)). Dow attorneys Shepherd, Sandt and Waterman also discussed Cadotte's MRI lab notebooks. (*Seebald Decl.*, Exh. 20 (Waterman Dep., Mar. 7, 2003, at 110:5–15, 121:3–22) (noting that the November 17, 1977 notebook page "obviously was a significant issue")). For example, Waterman went so far as to note that Dow should "[l]ook at it, it raises a flag." (*See id.* at 121:3–122:5).

Other Dow lawyers also testified that they had personal knowledge of Cadotte's MRI laboratory notebook. Dow attorney Phil Shepherd testified that he read the relevant page from Cadotte's laboratory notebook in April 1989 and understood that Cadotte created MPD–TMC membranes while working at MRI on November 17, 1977. (*Seebald Decl.*, Exh. 19 (Shepherd Dep., Dec. 13, 2002, at 144:13–145:13)). In addition, Dow counsel Bernd Sandt testified that he reviewed page 72 of Cadotte's MRI lab notebook in 1989, when *another* Dow attorney brought it to his attention. (*Seebald Decl.*, Exh. 18 (Sandt Dep., Apr. 9, 2003, at 40:3–10)). Finally, Dow lawyer Michael Glenn admitted that he knew about Cadotte's MRI notebook entries in 1989, before the May 1990 patent infringement lawsuit. Significantly, Glenn admitted that Cadotte's November 17, 1977 MPD–TMC membranes constituted an "invention." (*Seebald Decl.*, Exh. 16 (Glenn Dep., Dec. 13, 2002, at 86:10–89:7) (There was an "invention recorded in the MRI notebook.")).

Against this backdrop of overwhelming documentary evidence establishing Dow's lab notebook awareness and possession, is the Federal Circuit's express finding that "[i]t is clear that the invention conceived in November 1977 [and recorded in Cadotte's notebook] at MRI is the invention claimed in the '344 patent ... Cadotte may well

have refined the invention when he went to FilmTec ... the record is clear, however, *that his work in February 1978 was on the same invention that he conceived [at MRI] in November 1977." Hydranautics,* 982 F.2d at 1553 (emphasis supplied). Perhaps even more significant is Cadotte's own trial testimony in 1991 that the November 1977 and February 1978 membranes were virtually identical, with the exception of heat cure temperature. *(Seebald Decl.,* Ex. A, *Cadotte Trial Testimony,* (May 8, 1991) at 200:8–13.)

However, the heat cure differentials are distinctions without a difference. Thomas Hairston, Dow's Research Director for Separation Systems and John Cadotte's and Robert Petersen's boss at FilmTec, testified in February 2003 that subsequent heat cure has little or no impact on the reverse osmosis membrane's desalinating layer chemical structure. *(Seebald Decl.,* Ex. 25, *Hairston Depo.* (Feb. 11, 2003) at 282–84); *see also (Seebald Decl.,* Ex. B, *Petersen Depo.* (Oct. 17, 1989) at 97). Dow's other revisionist distinctions—adding dimethylpiperazine and using different cast and drying processes—are contrary to the Federal Circuit's conclusion that the only difference was heat. While the Court does not rely exclusively on the Federal Circuit's 1992 decision to grant partial summary judgment here, it nonetheless serves as further support for the obvious conclusion that any reasonable trier of fact would reach: "Cadotte's February [1978] experiments at FilmTec essentially duplicated his November [1977] experiments at MRI: he reacted the same proportions of TMC and MPD in the same manner for the same amount of time." *Hydranautics,* 982 F.2d at 1546.

Defendant's suggestion that it "reasonably believed" the 1977 and 1978 experiments were different because the experiments produced membranes with differing fluxes and salt rejection percentages is not well taken. Dow is one of the largest chemical manufacturers in the world. It is a sophisticated company with numerous patent litigation attorneys and experienced scientists. These specialists obviously knew about Cadotte's 1977 MRI experiments; they also knew that Cadotte's 1977 experiments were sufficiently similar to his 1978 experiments to warrant further investigation. Specifically, attorney Waterman testified that the MRI experiments raised a "flag" and amounted to a "significant issue." *(Seebald Decl.,* Exh. 20 (Waterman Dep., Mar. 7, 2003, at 110:5–15, 121:3–22, 121:3–122:5)).

Hence, Defendant resorts to an irrelevant attack on the Federal Circuit's ultimate title determination. *(See FilmTec Opp'n* (July 14, 2003) at 7) (arguing that the Federal Circuit relied on an "unusual legal analysis" and "novel" patent principles in determining that FilmTec did not own lawful title to the '344 patent). Again, the argument is not well taken. The Federal Circuit's conclusion remains the law of this case; it is not open to relitigation. *See Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.1993). "Under the 'law of the case' doctrine a court is generally precluded from reconsidering an issue that has already been decided by the same court[.]" *Id.; see also Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (explaining that the "law of the case" doctrine "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'"). Cadotte's invention conceived at MRI in 1977 is the same 1978 invention claimed in the '344 patent. *Hydranautics,* 982 F.2d at 1553. Furthermore, Dow knew or should have known the 1977 and 1978 membranes were the same-and were owned by the United States, not FilmTec.

Notably, as part of a 1994 analysis of potential legal action relative to patent liti-

gation losses, Dow's legal department presented its findings that: (1) "The key players of FilmTec were unjustly enriched"; (2) "Dow paid a lot for a business with a major part of the value being the Patent"; and (3) "Dow is a sophisticated company and knew what it was buying." (*See July 21, 2003 Sealed Doc.,* at FTMID014310, FTMID014312) ("Board Report"). This document clearly betrays Defendant's present self-serving reasonable reliance argument: Dow knew what it was buying. The Board Report reveals that Dow knew key FilmTec employees worked at MRI doing reverse osmosis government research prior to Dow's 1985 FilmTec acquisition. (*Id.* at FTMID041313). The Board Report specifically states: "Patent opposition due to work at MRI has been an issue *since 1984.*" (*Id.*) Further, the Board Report establishes Dow's notice that the '344 patent's title was long in dispute. (*Id.*) ("[The] Government investigated and requested information from FilmTec regarding [the] '344 patent and MRI shortly after [the 1985 FilmTec acquisition] and again in 1988."). Hence, the evidence before this Court unquestionably reveals that Dow knew or should have known that Cadotte's 1977 and 1978 experiments resulted in the same reverse osmosis membranes before suing Plaintiff for patent infringement in May 1990. That Dow elected to not pursue subsequent legal action against Cadotte and his co-founders does not alter this conclusion.

### 4. Cadotte's Invention Disclosure Form

Defendant's assertion that the 1977 and 1978 membranes were materially different also cannot be squared with its combined knowledge of Cadotte's MRI lab notebook and Cadotte's June 8, 1978 invention disclosure form. The 1978 disclosure form records Cadotte's declaration that he con-

ceived a MPD–TMC reverse osmosis membrane on February 23, 1978, *while working for FilmTec.* (*Seebald Decl.,* Exh. 9 (Invention Disclosure, June 8, 1978, at FTHP 0032461–462)). Dow knew about the invention disclosure because Dow relied on it in asserting FilmTec's title to the '344 patent. (*See Seebald Decl.,* Exh. 28 (Letter from Sandt to Klein, April 15, 1993, at FTHP 0002053) ("Dow accepted without reservation the ownership of the '344 patent as being in FilmTec.")). Indeed, Defendant concedes knowledge of Cadotte's 1978 invention disclosure form in its opposition brief. (*See Def's Opp'n* at 12.)

More importantly, comparing the invention disclosure form with Cadotte's MRI lab notebook page 72 reveals that the 1977 and 1978 membranes were chemically identical. (*Pl's P & A,* June 23, 2003, at 19). Both chemical reactions used the same reagents, support, solvents and reaction time. (*Id.*) There is no doubt—and no genuine issue of fact remains—that Dow's sophisticated chemists and patent attorneys understood that the 1977 and 1978 membranes were chemically identical. Indeed, the Federal Circuit expressly reached this conclusion in its December 1992 decision vacating Judge Thompson's original infringement judgment. *See Hydranautics,* 982 F.2d at 1553 ("It is clear that the invention conceived in November 1977 at MRI is the invention claimed in the '344 patent....[Cadotte's] work in February 1978 was on the same invention that he conceived in November 1977 ... Cadotte therefore conceived the '344 invention under the ['6521] contract."). Accordingly, the Court finds that Defendant knew about Cadotte's 1978 invention disclosure form—and its similarities to Cadotte's MRI lab notebook—before it initiated the patent infringement action in May 1990.[5]

---

**5.** On February 13, 1979 Cadotte purportedly assigned his "entire right, title and interest"

The undisputed evidence, taken together, establishes that in May 1990 Dow knew or should have known that Cadotte's 1978 invention assignment to FilmTec was invalid. The evidence reveals Dow's actual or imputed knowledge that Cadotte invented a MPD–TMC reverse osmosis membrane in 1977 at MRI, identical to the 1978 membrane created at FilmTec. Defendant's reliance on the 1995 Federal Circuit decision—that its suit against Hydranautics was not objectively baseless—has no bearing on whether Dow, in 1990, knew Cadotte's prior invention assignment was invalid. *See FilmTec v. Hydranautics,* 67 F.3d 931, 938 (Fed.Cir.1995). Rather, the documents before this Court plainly establish that Dow clearly understood the '6521 contract requirements (to which it was equally bound after the 1985 FilmTec acquisition) and that the underlying MRI employment contracts assigned all MPD–TMC membrane invention rights to the United States, not Defendant.

The evidence establishes as a matter of law that Dow knew about MRI's '6521 contract with the Government. Dow also knew the '6521 contract gave the Government title to any invention conceived under it. (*Seebald Decl.,* Exh. 21 (Letter from Shepherd to Waldrop and Whitney, March 28, 1990, at FTHP 0000190) (noting that government contracts "generally [grant] the [g]overnment title to inventions which were made under or during the course of [g]overnment contract...")). The Court additionally finds that before initiating patent infringement proceedings in May 1990, Dow knew Cadotte made an invalid assignment of his rights to the invention disclosed in the '344 patent. Dow knew that Cadotte assigned his rights, title and inter-

est in the February 1978 invention to FilmTec. Dow also knew that Cadotte's 1977 and 1978 membrane inventions were chemically identical. Finally, Dow knew that the '6521 government contract *or* the MRI employment contracts vested ownership of the 1977 membranes in the United States, and not Defendant.

**B.** *DOW KNEW THAT TITLE TO THE '344 PATENT WAS NOT VESTED IN FILMTEC WHEN IT AUTHORIZED FILMTEC'S PATENT INFRINGEMENT LAWSUIT AGAINST HYDRANAUTICS*

Based on the same evidence and for the same reasons, the Court additionally finds that Dow knew that title to the '344 patent was vested in the United States Government, not FilmTec, when it commenced patent infringement litigation against Plaintiff in May 1990. That the '344 patent title was in dispute was no surprise to Defendant. For example, the Board Report commissioned by FilmTec's Board states that the "Government investigated and requested information from FilmTec regarding [the] '344 patent and MRI...[in 1985] and again in 1988." (*See July 21, 2003 Sealed Doc.,* at FTMID014313). The considerable, uncontradicted and overwhelming evidence noted above can support only one conclusion by the trier of fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Partial summary judgment is clearly warranted.

**IV.** *CONCLUSION AND ORDER*

In light of the foregoing, the Court GRANTS Plaintiff's motion for partial

---

in the February 23, 1978 reverse osmosis membranes—disclosed in the June 8, 1978 invention disclosure form—to FilmTec. (*Seebald Decl.,* Exh. 12 (Cadotte Assignment, Feb. 13, 1979, at 1)). Dow does not dispute that it

knew of Cadotte's 1979 assignment to FilmTec. Therefore, the Court likewise finds that Dow knew about this 1979 assignment before Defendant launched its patent infringement action against Plaintiff in May 1990.

summary judgment in its entirety. (Doc. No. 457–1.)

**IT IS SO ORDERED.**

## ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION

By order dated August 5, 2003 this Court granted Plaintiff's motion for partial summary judgment. Defendant seeks reconsideration thereon. Having read and considered the papers submitted, the Court **DENIES** Defendant's reconsideration request.

### I. *LEGAL STANDARD*

■ It is well-settled that district courts have the authority to reconsider and revise interlocutory orders, such as orders granting motions for partial summary judgment. *Amarel v. Connell,* 102 F.3d 1494, 1515 (9th Cir.1996) ("[T]he interlocutory orders and rulings made pretrial by a district judge are subject to modification by the district judge at any time prior to final judgment."); *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461, 465 (9th Cir.1989); FED. R. CIV. P. 54(b). A district court may reconsider and revise a previous interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law. *Washington v. Garcia,* 977 F.Supp. 1067, 1068 (S.D.Cal.1997) (Stiven, J.); *Sport Squeeze, Inc. v. Pro–Innovative Concepts, Inc.,* 51 U.S.P.Q.2d 1764, 1771, 1999 WL 696009 (S.D.Cal.1999). However, a court should generally leave a previous decision undisturbed absent a showing that it either represented clear error or would work a manifest injustice. *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

### II. *DISCUSSION*

Defendant offers several grounds for reconsideration but none overcome one central and undisputed fact: the '6521 contract established the Government's right to own all Cadotte MRI inventions. Cadotte failed to comply with the '6521 contract; his failure (and consequences thereon) are imputed to Defendant.

■ First, Defendant argues that the August 5, 2003 grant of partial summary judgment cannot be logically squared with this Court's May 2002 order which denied summary judgment on similar issues. Defendant is wrong. It is well-settled that a denial of summary judgment does not establish law of the case and does not preclude a second motion for summary judgment. *See Shouse v. Ljunggren,* 792 F.2d 902, 904 (9th Cir.1986) (*citing Preaseau v. Prudential Ins. Co. of America,* 591 F.2d 74, 79–80 (9th Cir.1979)); *Dessar v. Bank of America Nat. Trust and Sav. Ass'n,* 353 F.2d 468, 470 (9th Cir.1965); *Beedy v. Washington Water Power Co.,* 238 F.2d 123, 127 (9th Cir.1956); *Breeland v. Southern Pac. Co.,* 231 F.2d 576, 579 (9th Cir. 1955); *Curran v. Kwon,* 153 F.3d 481, 487 (7th Cir.1998). As such, any statements contained in the Court's 2002 orders do not necessarily bind the Court's subsequent determinations, including the Court's August 5, 2003 order in Plaintiff's favor. The record presented in 2003 was far more developed than the 2002 record. Here, partial summary judgment was warranted; no genuine issues remain on the knowledge and title issues.

Defendant's next suggestion that the Court's "knew or should have known" language is erroneous is a distinction without a difference. The Court simply used the phrase to confirm Defendant's *actual* knowledge of all matters charged. Moreover the Court's footnote 2 more than clarified any confusion that may have arisen on this narrow and largely immaterial issue. As thoroughly detailed in the August 5, 2003 order, the Court reiterates its con-

clusion here: the Court finds as matter of law that Filmtec and Dow knew the assignment of Cadotte's MPD/TMC membrane invention to Filmtec was invalid. Additionally, Filmtec and Dow knew that the Government owned '344 patent title when Filmtec sued Hydranautics in 1990.

Notably absent from Defendant's reconsideration brief is any attempt to contradict or even address the undisputed evidence about Defendant's '6521 contract knowledge and Defendant's own admissions related thereto (testimony from Defendant personnel including Glenn, Sandt, Shepherd, Waterman and Petersen). Under the '6521 contract, MRI (through its employees) researched reverse osmosis desalinization membrane technology for the United States Government. (*Seebald Decl.*, Exh. 4 ('6521 Contract, at Art. I)). Title to any discoveries made while working under the '6521 contract vested in the Government. (*Id.* at § 35(b)(2) ("The Contractor...does hereby grant to the Government the full and entire domestic right, title and interest in the Subject Invention.")). Despite Defendant's clever efforts to preserve genuine issues for trial, the '6521 contract requirements are established by *undisputed* evidence: the express terms of the contract itself and the federal statutes relating thereto.

Even more telling, the '6521 "clawback provision" assigns any Cadotte invention to the Government, even inventions arising after he left MRI employment. (*See* '6521 contract, Art. I, § 35(f)(1)). Likewise, Cadotte's 1976 MRI employment contract required Cadotte to assign to MRI any inventions made while working at MRI; or for twelve months after departing MRI. (Cadotte–MRI Employment Contract, June 1, 1976, at ¶ 3). Under either scenario, and under either contract's clawback provisions, the "new" membranes that Cadotte discovered shortly after leaving MRI for Filmtec was Government property.

The clawback provisions are significant because it renders moot Defendant's efforts to create genuine issues of material fact regarding whether Cadotte's November 1977 experiments were the same as or different from Cadotte's February 23, 1978 efforts. The '6521 provision maintained the Government's ownership in *any* thin-film reverse osmosis desalinating membrane that Cadotte invented through April 15, 1978 *regardless* of the membranes' underlying scientific nature. The mere fact that Defendant's experts and witnesses opine and speculate that the two experiments were sufficiently disparate to warrant suit does not overcome Plaintiff's ability to secure partial summary judgment.

Either contract standing alone ('6521 or the 1976 MRI employment agreement) bars Defendant's strained position as a matter of law. The two experiments' underlying scientific details are irrelevant. The clawback provisions were specifically designed to prevent former government employees from engaging in "Eureka!" scientific discovery tactics after leaving a government research position. Absent these provisions, any scientist (e.g. Cadotte) could make lucrative laboratory discoveries, quit their job, start their own company, and make the same discovery all over again. Federal law and the parties' contracts here expressly barred such misconduct.

Even assuming the two experiments' scientific nuances were relevant, the two experiments were one and the same. As noted by the Federal Circuit in 1992, "[i]t is clear that the invention conceived in November 1977 [and recorded in Cadotte's notebook] at MRI is the invention claimed in the '344 patent ... Cadotte may well have refined the invention when he went to FilmTec ... the record is clear, however, *that his work in February 1978 was on the same invention that he conceived [at*

*MRI] in November 1977." Hydranautics,* 982 F.2d at 1553 (emphasis supplied). This Federal Circuit finding only further illustrates this Court's proper conclusion detailed in the Court's August 5, 2003 order. No genuine issues of material fact remain. The Court once again finds that before suing Plaintiff in 1990, Defendant knew that Cadotte's 1977–1978 membranes belonged to the United States and no one else. No jury could reasonably find otherwise.

Defendant's tenuous suggestion that Cadotte was not a Filmtec founder borders on the absurd and potentially implicates Rule 11. Fed.R.Civ.P. 11(b)(4)(denials of factual contentions must be warranted on the evidence). For the past ten years every court that has examined this matter has referred to Cadotte as a Filmtec Founder. *See e.g. Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 882 (9th Cir.2000) ("John E. Cadotte and three others founded Filmtec Corporation in 1977. Prior to founding Filmtec, Cadotec...."); *Hydranautics v. Filmtec Corp.,* 70 F.3d 533, 534 (9th Cir.1995) ("Mr. Cadotte and others at the nonprofit formed a for-profit corporation, Filmtec, for the purpose of commercially manufacturing reverse osmosis membranes."); *Filmtec Corp. v. Allied–Signal Inc.,* 939 F.2d 1568, 1574 (Fed.Cir.1991) ("Since Cadotte was one of the four founders of Filmtec..."); *FilmTec,* 982 F.2d at 1549 ("Cadotte left MRI on December 31, 1977 and joined Filmtec as one of its four co-founders."). Cadotte's central role in both Filmtec's formation and subsequent financial success cannot be reasonably disputed by either party, let alone form the basis for reconsideration.

Defendant next suggests that although Cadotte admitted to signing the 1976 MRI Employment Contract, "Cadotte never acknowledged that he read or signed the agreement." Once again, Defendant's position strains credulity. It is undisputed that Cadotte signed the MRI Employment contract; he conceded at his own deposition that his signature clearly appeared thereon. (Cadotte Depo., Jan. 19, 2000, at 22:15–24). Applying either Minnesota or California law, the result is the same: Cadotte, is bound by the contract's terms regardless of his professed forgetfulness years after the fact. *See Schumann v. AMCO Ins. Co.,* 2003 WL 21694552 (Minn. App. July 22, 2003) (person signing contract is bound by its terms) (citing *Sorenson v. New York Life Ins. Co.,* 195 Minn. 298, 300, 262 N.W. 868, 869 (1935)); *Powell v. Trans Global Tours, Inc.,* 594 N.W.2d 252 (Minn.App.1999) (failure to read contract terms did not invalidate contract); *Greer v. Kooiker,* 312 Minn. 499, 508, 253 N.W.2d 133, 140 (1977) ("a party to a contract on which others have relied cannot avoid the duties of the document by showing he did not know its contents."); *Krumholz v. Rusak,* 230 Minn. 178, 183–84, 41 N.W.2d 177, 181 (1950) (court properly instructed jury that it could find contract existed between parties if signed by defendant or by her husband); *compare Operating Engineers Pension Trust v. Gilliam,* 737 F.2d 1501, 1504 (9th Cir.1984) ("[one] who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it.") (applying California law); Restatement 2d Contracts § 23, Comments b, e (1981); *McClure v. Cerati,* 86 Cal.App.2d 74, 84–85, 194 P.2d 46 (1948) (party signing a contract should be charged with knowledge of its contents).

While Filmtec's knowledge of Cadotte's MRI Employment contract was not necessary to the Court's August 5, 2003 summary judgment holding, nothing before the Court compels it to alter its prior observation that "[t]he evidence reveals that Dow knew or should have known about Cadotte's MRI employment contract when

Defendant launched its May 1990 patent infringement suit. The parties do not dispute that Dow acquired Cadotte's FilmTec Corporation on August 7, 1985. In so doing, Dow assumed the rights and liabilities affiliated with FilmTec, including contractual limitations on Cadotte's prior inventions." (*August 5, 2003 Order* at 8:5–9). Defendant cannot hide behind its corporate veil to avoid Cadotte's Government invention disclosure duties under either the '6521 contract or Cadotte's 1976 MRI Employment Contract. *W.R. Grace & Co., Inc. v. Western U.S. Industries, Inc.,* 608 F.2d 1214, 1218 (9th Cir.1979) ("it is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself.").[1] Indeed, Dow executive Frank Whitney testified that after the 1985 acquisition, Filmtec's functions were fully integrated with Defendant Dow. (*Whitely Depo.* (April 8, 2003) at 54).

## III. *CONCLUSION AND ORDER*

In light of the foregoing, the Court **DENIES** Defendant's motion for reconsideration. (Doc. No. 503–1). The Court's order dated August 5, 2003 shall remain undisturbed.

**IT IS SO ORDERED.**

---

1. The Court agrees that the August 5, 2003 order's statement that "Dow's undisputed examination [of Cadotte's MRI lab notebooks] prior to its 1985 Filmtec acquisition" was wrong, but the August 5, 2003 conclusion to grant Plaintiff partial summary judgment remains the same. Defendant concedes to have received and examined the lab notebooks no later than mid–1989, well before Defendant's commencement of its infringement action against Plaintiff. This mistake is therefore harmless error and does not alter the Court's conclusion to grant partial summary judgment.